# COMPOSITE EXHIBIT "C"

**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| AARON KIM, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| Plaintiff, | ) ) | No. 06 C 01585 |
| v. | ) ) | Judge Matthew F. Kennelly |
| RISCUITY, INC., a Delaware Corporation, | ) ) | |
| Defendant. | ) | |

------------------------------------------------------------x

**PLAINTIFF'S PETITION FOR CLASS
COUNSEL'S ATTORNEYS FEES AND COSTS**

**INTRODUCTION**

After a year of hard-fought litigation by the parties, the Court is set to consider final approval of a class-wide settlement.   Although this lawsuit was marked by a surprising amount of obfuscation and needless litigation tactics employed by Riscuity, Class Counsel secured a settlement providing the class members with virtually complete relief, consisting of a total discharge of the debt at issue in the lawsuit, the automatic return of all money paid to Riscuity on the challenged Bally contracts, and the repair of the credit reports of the respective class members.  In total, the settlement is worth over $820,000.

Class Counsel respectfully requests that the Court award fees and costs of $205,000, amounting to approximately 25% -- the "benchmark" for class action attorneys fees -- of the settlement value.  When viewing their request from a lodestar perspective, Class Counsel are seeking a multiplier of approximately 2, again well within the range of reasonableness.

**FACTS**

1.      **The Lawsuit**

    A.      **Bally's underlying violations of Illinois' Physical Fitness Services Act**

On November 20, 2002, Aaron Kim signed up for a membership at a Bally Total Fitness

Health club.  First Amended Class Action Complaint (hereinafter, "Complaint," attached hereto

as Exhibit A) ¶ 21. Under the terms of the "contract," Kim was obligated to pay a "Membership

Fee" of over $1,530.00, consisting of a $100.00 up-front payment due immediately, with the

remaining amount to be financed and paid off in equal monthly installments over the next 36

months.  Kim was further obligated to pay nominal monthly dues of $6.00 – well under 10% of

the cash price of the original membership.  Complaint ¶ 22.

Kim alleges that this price structure violates Section 8(b) of the Illinois Physical Fitness

Services Act ("PFSA"), which provides:

> The initial term of services to be rendered under the contract may
> not extend over a period of more than 2 years from the date the
> parties enter into the contract; **provided that the customer may
> be given an option to renew the contract for consecutive
> periods of not more than one year each for a reasonable
> consideration not less than 10% of the cash price of the
> original membership**.

815 ILCS 645/8(b) (emphasis supplied).[1]  The Act further provides that all non-complying

contracts are void and provides a private right of action to injured consumers.  *See* 815 ILCS

645/9(c); 815 ILCS 645/11.

---

[1]   The Illinois Appellate Court explained the purpose of Section 8(b)'s requirement that renewal
fees must be at least ten percent of the price of the original membership:

> If the original membership price pays for many subsequent
> renewal periods, the contract effectively ties the member to a
> prohibited long-term contract. The requirement that a renewal must

2

In November of 2004, the Illinois Appellate Court issued a decision leaving little doubt that these "frontloaded" Bally contracts are illegal.  *See Pulcini v. Bally Total Fitness Corp.*, 353 Ill. App. 3d 712, 820 N.E.2d 31 (1st Dist. 2004), *appeal denied*, 214 Ill.2d 551, 830 N.E.2d 9 (2005).

### B.    Riscuity's Attempts to Collect Illegal Contracts

After Kim supposedly stopped making payments under the Bally "contract," Bally sent his account to collections.  Complaint ¶ 6.  Riscuity subsequently bought this debt (along with the debt of numerous others) and made efforts to collect upon it, including, in 2006, sending out a debt collection letter through an agent.  *Id*. ¶¶ 4, 18, 23, 24.  Riscuity currently claims that Kim owes it approximately $1200.  *Id*. ¶ 25.

### C.    Kim's Legal Theories

Kim's initial complaint, filed on March 26, 2006, advanced four counts.  The first count sought a declaration that the underlying contracts are void.  The second and third counts were brought under the Fair Debt Collection Practices Act ("FDCPA"), 16 U.S.C. § 1692, *et seq.* and the Illinois Collection Agency Act ("ICAA"), 225 ILCS 425/1 *et seq.*   The final count was brought pursuant to the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*.

---

cost more than one-tenth of the cost of the initial period assures
that the member has a significant cancellation option at the end of
each renewal period.

*See Pulcini v. Crunch Total Fitness Corp*., 353 Ill.App.3d 712, 717, 820 N.E.2d 31, 35  (1st Dist. 2004).

2.    **Procedural History**

Riscuity responded to Kim's initial complaint by moving to dismiss three out of its four counts.  The Court upheld two of those counts and struck one without prejudice.  *See Kim v. Riscuity, Inc.*, No. 2006 WL 2192121 (N.D. Ill. July 31, 2006).[2]

Following the Court's decision, Kim served discovery and collected virtually all of the information he needed in this lawsuit.  *See Affidavit of Jay Edelson in Support of Award of Attorneys Fees* ("Edelson Aff.), ¶10.  The two parties also began serious settlement discussions as part of negotiations involving a larger, global settlement of a number of related cases involving Bally Total Fitness and other debt collectors.  *Id*. ¶10.  In July of 2006, Kim believed that a settlement in principle had been reached; Riscuity disputed that point.  *Id*. ¶11.  Throughout the next two months, the parties began a new round of settlement negotiations, which in Kim's view resulted in a (second) enforceable settlement agreement in October of 2006.  Riscuity again maintained that no enforceable settlement had been reached.  *Id*. ¶11.

Kim responded by amended his complaint to include a count alleging the breach of both settlement agreements and including new claims for consumer fraud and violation of the PFSA.  He also filed a motion to enforce the October settlement agreement.  *Id*. ¶12.

Riscuity fought the motion to enforce, filing affidavits indicating that it had sold off some 95% of the debt at issue and claiming that it could not repurchase that debt.  Even after the Court ordered an evidentiary hearing to test its affidavits (and the counter-affidavits filed by Kim), Riscuity continued to insist that it could not re-purchase the underlying debt.  *Id*. ¶13.

---

2  Specifically, the Court struck Kim's Illinois consumer fraud count on the grounds that "he does not allege that Riscuity knowingly violated the IPFSA."  *Kim*, No. 2006 WL 2192121, *4.

4

Class Counsel, having for the first time received discovery into this issue, ascertained that (1) Riscuity had an absolute contractual right to repurchase the underlying debt and (2) that PRS -- the company to which Riscuity had sold the debt -- was indeed willing to transfer it back to Riscuity.  At the request of Class Counsel, PRS effectuated that transfer.  *Id*. ¶14.

Following Class Counsel's actions, Riscuity agreed to the instant settlement.  *Id*. ¶15.

**3.      The terms of the Settlement**

Under the terms of the Settlement, the class members are entitled to four things:  First, their underlying Bally debt – a total of some $813,568 -- will be completely discharged.  Second, to the extent they paid any money to Riscuity on this debt, all of such money -- $8,327.27 in total -- will be automatically returned to them.  Third, Riscuity will contact the credit reporting agencies where necessary so that the class members' respective credit reports no longer reflects that they owe this money.  Fourth, Riscuity will pay Class Counsel's reasonable expenses and fees, as determined by the Court, rendered for the benefit of the class.

Riscuity has agreed that, for purposes of determining attorneys fees, Kim will be deemed the prevailing party, both on each count pleaded in the Amended Complaint specifically and in the Lawsuit more generally.  Finally, Riscuity has additionally agreed to pay for the cost of notice and settlement administration as well as an additional $2,000 incentive award to Kim.

## ARGUMENT

**I.      The Court should use the percentage-of-recovery approach in determining fees**.

In assessing the reasonableness of a fee request, "there are two generally accepted methods for calculating the amount of fees that plaintiffs' counsel may recover from the fund: the lodestar method and the percentage-of-the-fund method."  *Gaskill v. Gordon*, 942 F. Supp. 382, 385 (N.D. Ill. 1996).  The percentage-of-recovery or common benefit approach, similar to a

private contingent fee agreement, provides Class Counsel with a percentage of the value available to the class as a whole.  The lodestar method starts with the value of the total attorney time (*i.e.*, the rates of class counsel multiplied by the hours expended on the litigation) and then uses a multiplier to compensate class counsel for the risks incurred and to reward them for the benefits achieved.

In the instant case, Class Counsel's fee request should be granted under either approach.

### A.  Percentage of the Common Benefit Approach

The "recent trend has been toward utilizing the percentage method in common fund cases." *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1995)**;** *accord, Gaskill*, 942 F. Supp. at 386**.**  Indeed, by 1995 "most federal circuits that have revisited the issue recently either have abandoned the lodestar in favor of a percentage fee in common fund cases or have granted the district court discretion to determine which method is more suitable in a particular case." *Ryan v. City of Chicago*, 274 Ill.App.3d 913, 923, 654 N.E.2d 483, 491 (1st Dist. 1995) (citations omitted).  In recent years the trend towards using the percentage of recovery approach has only escalated.  "Given the issues likely to arise in computing a lodestar, courts across the country, both federal and state, are retreating from a lodestar analysis in favor of setting common benefit fees at a percentage of the benefit secured, especially in common fund cases." *In re Bayou Sorrel Class Action*, No. 6:04CV1101, 2006 WL 3230771, *3 (W.D.La. Oct. 31, 2006) (collecting cases).

Strikingly, the very court that developed the lodestar method, the Third Circuit, ultimately identified no fewer than nine substantial defects within it.  *See Ryan v. City of Chicago*, 274 Ill. App. 3d 913, 923, 654 N.E.2d 483, 490-91 (1st Dist. 1995) (discussing the

Third Circuit's evolving view).  As summarized by the Illinois Appellate Court, the most

significant deficiencies of the lodestar method are that:

> (1) it increases the workload of an already overtaxed judicial
> system, (2) it is insufficiently objective and produces results that
> are far from homogenous, (3) it creates a sense of mathematical
> precision that is unwarranted in terms of the realities of the
> practice of law, (4) it is subject to manipulation by judges who
> prefer to calibrate fees in terms of percentages of the settlement
> fund or the amounts recovered by the plaintiffs or of an overall
> dollar amount, (5) it has led to abuses such as lawyers billing
> excessive hours, (6) it creates a disincentive for the early
> settlement of cases, (7) it does not provide the trial court with
> enough flexibility to reward or deter lawyers so that desirable
> objectives will be fostered, (8) it works to the particular
> disadvantage of the public interest bar because the lodestar is
> lower in civil rights cases than in securities or anti-trust cases, and
> (9) it is confusing and unpredictable in its administration.

*Id*.  Ultimately, "[t]he task force recommended retention of the lodestar in some statutory fee

cases but concluded that a percentage fee was the best determinant of the reasonable value of

services rendered by counsel in common fund cases."  274 Ill. App. 3d at 923, 654 N.E.2d at 491

(citing Third Circuit Report, 108 F.R.D. 255-56); *see also, O'Keefe v. Mercedes-Benz USA, LLC*,

 214 F.R.D. 266, 304 (E.D. Pa. 2003) ("The parties and the court are well aware of the demise of

the pure lodestar method because it encouraged inefficient behavior, turned judges into bean

counters and created antagonistic interests between the class and class counsel.").

Conversely, the percentage of recovery approach "'rests on the perception that persons

who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the

successful litigant's expense.'" *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir.

1988) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). As such, this approach

results "in a sharing of the fees among those benefited by the litigation." *Brown*, 838 F.2d at 454.

Kim submits that this Court should similarly apply the percentage of recovery method in determining the appropriate fees for Class Counsel.

### B.      The Value of the Settlement to the Class Members

Under the common benefit approach, attorneys for the class are typically allowed around 25% of the cash value of the settlement.  *See Gaskill v. Gordon*, 160 F.3d 261 (7th Cir. 1998) (noting that typical contingency fees are between 33% and 40%, and that "[s]ome courts have suggested 25% as a benchmark figure for a contingent-fee award in a class action."); *accord Torrisi v. Tucson Electric Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) ("in common fund cases such as this, we have established 25% of the common fund as the 'benchmark' award for attorney fees.").

Here, Class Counsel secured approximately $813,568 in debt relief and around $8,300 in cash refunds, not including the value of the credit repair to be provided to class members.

It is well established that debt relief secured on behalf of class members is treated as a cash equivalent for purposes of both creating a common fund and determining attorneys fees. *See, e.g., Cullen v. Whitman Medical Corp*,.197 F.R.D. 136, 147 (E.D.Pa.,2000) (holding that in determining proper amount of class action attorneys fees, debt relief operates as cash in quantifying amount of common benefits going to the class, where other non-monetary relief was also obtained and awarding 1/3 of amount for fees .); *In re Lloyd's American Trust Fund Litigation*, No. 96 Civ.1262, 2002 WL 31663577 (S.D.N.Y. Nov. 22, 2002) (adding both cash relief and face value of credit notes to be used to pay down debt in quantifying common fund for use in determining class action attorneys fees, *i.e.*, 28% of the common fund); *Follansbee v. Discover Financial Services, Inc.*, No. 99 C 3827, 2000 WL 804690 (N.D. Ill. June 21, 2000)

8

(awarding 21% of common fund - consisting of cash and partial debt relief - to class counsel); *Pigford v. Glickman*, 185 F.R.D. 82, 108 (D.D.C. 1999).

Under this clear precedent, the instant settlement should be valued at over $820,000. Class Counsel's request for fees equals 25% of this amount – the "benchmark" for awarding attorneys' fees in common fund cases.[3]  The fee request should be approved under a common benefit analysis.

**II.     The fee request is likewise reasonable under the lodestar approach.**

Even were the Court to use the lodestar approach, Class Counsel's fee request still should be granted.  Class Counsel has over $102,000 in attorney time to date.  *See* Edelson Aff., ¶ 21. Class Counsel's billing rates are reasonable and have been repeatedly approved by the courts. *See id.* ¶¶24-26.  A fee award of $205,000 will thus amount to a multiplier of approximately just under two.

As the Seventh Circuit has noted, in common fund cases where the lodestar approach is used, a risk multiplier is "not merely permissible, but mandated" where plaintiff's counsel "had no sure source of compensation for their services*." Cook v. Niedert*, 142 F.3d 1004, 1015 (7th Cir. 1998); *see also, In re Abbott Laboratories Securities Litigation*, No. No. 92-C-3869 MEA, 1995 WL 792083, *13 (N.D.Ill. July 3, 1995) (same).[4]  The choice of multiplier is "left to the

---

3  Indeed, to determine the true amount of the fund that the defendant would be establishing for the benefit of the class, the requested $205,000 should be added to the $820,000, because Riscuity is paying Class Counsel's fees  in order to preserve the remaining benefits going to the class.  Under that calculation, the instant fee request amounts to only approximately 20% of the fund.

4  Although several counts in Kim's  Complaint were brought pursuant to statutes containing fee-shifting provisions, that does not change the fact that the instant settlement created a common fund and should be so treated.  *See Cook*, 142 F.3d at 1015.  Further, even if fees in this case were treated being granted pursuant to fee-shifting statutes, because Kim's

9

district court's discretion" -- although it should be guided by the Court's calculation of the

probability of the suit's success as viewed from the outset of the litigation -- and the observation

of the percentage-of-the-recovery approach may serve as a "reasonable check" for the selection

of a multiplier.  *See Cook,* 142 F.3d at 1013.

Courts using the lodestar approach frequently award multipliers up to four.  *See*, 4

Newberg on Class Actions § 14:6; *see also, Baksinksi v. Northwestern University*, 231 Ill. App.

3d 7 (1st Dist. 1992); *Sampson v. Eastman Kodak Co.*, 195 Ill. App. 3d 715 (1st Dist. 1990).  But

"[a] large common fund award may warrant an even larger multiple."  4 Newberg on Class

Actions § 14:6.  Indeed, where other circumstances dictate, much higher multipliers have been

found appropriate.  *See, e.g., Michels v. Phoenix Home Life Mut. Ins. Co.*, No. 95/5318, 1997

WL 1161145, at *32 (N.Y.Cty. Jan. 7, 1997) (noting that courts have awarded multiples as high

as 6 or 12 times the lodestar[5]); *Weiss v. Mercedes-Benz of North America, Inc.*, 899 F. Supp.

1297 (D.N.J. 1995) (awarding a multiplier of 9.3), *affirmed*, 66 F.3d 314 (3rd Cir. 1995);

*Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D.N.Y.1991) (multiplier of 8.74)*; Stop & Shop

Supermarket Co. v. SmithKline Beecham Corp.*  No. 213926, 2005 WL 1213926, *17 -18

(E.D.Pa. May 19, 2005) (multiplier of 15.6); *Glendora Community Redevelopment Agency v.

Demeter*, 155 Cal.App.3d 465, 479-80, (Cal.Ct.App.1984) (multiplier of 12).

---

claims were brought under state as well as federal law -- and, as noted above, Riscuity has
agreed that Kim prevailed on all counts for present purposes -- the limitations on risk multipliers
for federal fee-shifting statutes discussed in *City of Burlington v. Dague*, 505 U.S. 557 (1992),
are not applicable.  *See, e.g., Davis v. Mutual Life Ins. Co.,* 6 F.3d 367, 383 (6th Cir. 1993) ("The
United States Supreme Court's interpretation of federal fee-shifting statutes, of course, does not
control our interpretation of that state statute.").

[5]  The *Michels* court further noted that "many courts have recognized that generous fee
awards in cases such as this serve the dual purpose of encouraging plaintiffs' attorneys to act as
private attorneys general and discouraging wrongdoing."  *Id.* at *32.

10

This case was anything but a sure bet for Class Counsel.  Although the form contract at issue in this suit had been repeatedly challenged in the Illinois state and federal courts, Bally had won each and every case.  *See, e.g., Acevedo v. Bally Total Fitness Corp.*, No. 99 C 1289, 1999 WL 1045035 (N.D. Ill. Nov. 12, 1999) (dismissing TILA claims based on contract that also violated PFSA); *Turner v. Bally Total Fitness Corp.*, No. 1999 CH 06484 (Cir. Ct. Cook Cnty) (class action filed in April 1999 voluntarily dismissed in December 1999).  Further, there was no case authority on the central issues of this case -- most significantly whether the PFSA rendered Bally's price structure illegal, whether such illegalities voided the contracts, and whether the debt collectors had a duty to investigate whether the contracts it bought were potentially illegal.

Finally, when faced with Kim's motion to enforce the parties' settlement agreement, Riscuity submitted deceptive affidavits, which, if believed, would have allowed it to escape virtually all liability.  Rather than accepting these at face value, Class Counsel sought out the truth, both through formal avenues of discovery and in an independent investigation that lead to Riscuity's re-purchase of the contracts at issue and allowed the settlement to be completed.  In sum, Class Counsel surmounted several substantial obstacles beyond those normally encountered in consumer protection litigation and secured an enormous victory, providing the class with between essentially total relief.  As a result, hundreds of Illinois consumers, each of whom was previously burdened with substantial debt, will be free of the obligations forced on them by unfair and illegal contracts.

A multiplier of two is justified – particularly so given that Class Counsel took pains to negotiate class relief before discussing attorneys fees with defendant.  For although the payment of the class's attorneys fees benefits the class by keeping the remainder of the fund intact, there

11

has never been any risk that other aspects of the relief secured by Class Counsel for the class's benefit could be impaired by the instant fee request.

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully requests that this Court award Class Counsel $205,000.00 for their fees and costs and grant Plaintiffs such other and further relief the Court deems fit.

Dated:  April 17, 2007                          By:_____/s/ Jay Edelson_____
                                                one of Plaintiffs' Class Counsel

Gino L. DiVito
Tabet DiVito & Rothstein LLC
209 S. LaSalle Street, 7th Floor
Chicago, IL 60604
(312) 762-9460
Firm I.D. No. 38234

John Blim
Jay Edelson
Blim & Edelson, LLC
53 West Jackson Blvd., Ste. 1642
Chicago, Illinois 60604
(312) 913-9400
Firm I.D. No. 38373

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he served the foregoing document on the following person(s) by electronic transmission on April 16, 2007:

Mike Lieber
McGuireWoods
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818

/s/ Jay Edelson

1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**

8 **SOUTHERN DISTRICT OF CALIFORNIA**

9

10 CHARLES SMITH, HECTOR CASAS, and BARRY NEWMANN, individually and on behalf of all other similarly situated,

11

12                                          Plaintiffs,

13        vs.

14

15

16 CRST VAN EXPEDITED, INC., et al.,

17                                          Defendants.

18

19

CASE NO. 10-CV-1116- IEG (WMC)

**ORDER:**

**1.    GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AWARD OF INCENTIVE PAYMENTS TO CLASS REPRESENTATIVES**

[Doc. No. 88]

**2.    GRANTING MOTION FOR ATTORNEYS' FEES AND COSTS.**

[Doc. No. 81]

20        Presently before the Court are Plaintiffs' motion for final settlement approval and incentive

21 payments to class representatives, [Doc. No. 88], and Plaintiffs' motion for attorneys' fees and

22 costs. [Doc. No. 81.]  For the reasons stated below, both motions are **GRANTED.**

23                                  **BACKGROUND**

24        This is a class action by truck drivers against their employer, CRST Van Expedited, Inc.

25 ("CRST"), for failure to pay minimum wages during certain stages of the company's driver training

26 program and related violations of California Business and Professions Code Section 17200. [*See, e.g.*,

27 Doc. No. 1, Ex. A (original complaint).]   The class is represented by Charles Smith, Hector Casas,

28 and Barry Newmann (collectively, the "Class Representatives").  Three portions of CRST's training

program, (1) truck driver training school; (2) orientation; and (3) over-the-road training, pertain to the claims alleged as follows:

1. <u>Truck driver training school</u>: Certain drivers, referred to as Contract Student Drivers, were required to attend an 8 month truck driving school with the option of doing so at CRST's expense if they signed Driver Employment Contracts.  Under the Driver Employment Contracts, if those drivers did not remain employed with CRST for a full 8 months, they would be obligated to pay CRST $3,950.  This amount was ostensibly to repay the cost of the program, but was in fact $2,450 more than the cost of the program, and thus Plaintiffs allege the obligation to pay constituted an unenforceable penalty.

2. <u>Orientation</u>: All drivers were required to attend orientation, for which no compensation was paid.  Plaintiffs allege they were entitled to California and federal minimum wage for the roughly 29 hours spent in this orientation.

3. <u>Over-the-road training</u>: Certain drivers were required to participate in over-the-road training, for which they received a flat $50 per day rate for 28 days.  Plaintiffs allege this rate failed to meet the California and federal minimum wage.

After nearly three years litigating these claims, the parties agreed to a proposed settlement, [*see* Doc. No. 76-4 at 12-108 (Joint Stipulation of Settlement and Release of Class Action) (the "settlement")], which the Court preliminarily approved on April 23, 2012. [Doc. No. 78.] For settlement purposes,[1] the Court certified the following class divided into subclasses:

Persons who resided in the State of California at the time of their date of hire and who worked as truck drivers for CRST Van Expedited, Inc. between November 5, 2005 and April 23, 2012. These persons are divided into the following subclasses:

**Subclass 1** – Contract Student Drivers [Drivers who attended truck driver training school at CRST's expense] who worked for CRST for more than 8 months, or who have a current balance that CRST contends is still owed for training expenses which is less than $500;

**Subclass 2** – Contract Student Drivers who have a current balance of $500 or more, which CRST contends is still owed for their training expenses, or who are employed by CRST as of the date of Preliminary Approval Date, but have not completed the 8 months required by their Driver Employment Contacts; and

**Subclass 3** – Drivers who were not Contract Student Drivers [Drivers who (a) paid for their own truck driver training school, (b) who pre-paid CRST for the cost of truck driver training school, or (c) who already had their Commercial Driver's License when they started work for CRST and did not attend truck driver training school].

As consideration for the release of all claims expressly and derivatively asserted in this action, the settlement provides the class with a total financial benefit in excess of $11,600,000.

---

[1]     Having reviewed this class definition again, the Court hereby adopts its prior analysis and finds the requirements of Fed. R. Civ. P. 23 met for final settlement approval. [*See* Doc. No. 78.]

This includes a non-reversionary $2,625,000 cash payout and over $9,000,00 in outstanding debt under the Driver Employment Contracts that CRST agrees to relieve.  In addition to the financial benefits of the settlement, CRST has agreed to significant changes to its policies and training program that will benefit its employees going forward, including a full disclosure form provided to employees prior to enrollment in the training program, temporary employee status for drivers when tested by the Department of Motor Vehicles, payment for drivers during orientation going forward, payment by a split mile basis rather than $50 per day for over-the-road training going forward, and a $250 bonus going forward for all drivers who remain employed eight months after completion of the training program.  [*See* Doc. No. 88-5.]

## DISCUSSION

### I.      Final Approval of the Settlement

Voluntary conciliation and settlement are the preferred means of dispute resolution in complex class action litigation.  *Officers for Justice v. Civil Service Com'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).  And though, "[u]nlike the settlement of most private civil actions, class actions may be settled only with the approval of the district court," "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited." *Id.* at 623, 625; *see also* Fed. R. Civ. P. 23(e).  Courts are not "to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute," nor is "[t]he proposed settlement [] to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Id*.  Rather, "a district court's only role in reviewing the substance of [a] settlement is to ensure that it is 'fair, adequate, and free of collusion.'"  *Lane v. Facebook,* __F.3d__, 2012 WL 4125857, at *3 (9th Cir. Sept. 20, 2012) (citing *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1026 (9th Cir. 1998)).

In making this appraisal, courts have "broad discretion" to consider a range of factors such as "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class

1   members to the proposed settlement." *Id.* (citing *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370,

2   1375 (9th Cir.1993)).  "The relative importance to be attached to any factor will depend upon and

3   be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts

4   and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625.

5        Here, the Court finds the proposed settlement fair, adequate, and free of collusion.  As

6   discussed more fully below, the settlement is the product of arms-length negotiations by

7   experienced counsel before a respected mediator, reached after and in light of years of litigation

8   and ample discovery into the asserted claims, and provides the class with both a substantial cash

9   recovery as well as significant debt relief, which together amount to over $11,600,000 in

10  ascertainable financial value.  Moreover, the reaction of the class has been overwhelmingly

11  positive and the lone objection is without merit.[2]

12       **A.     Strengths and Risks of the Case and Value of the Settlement**

13       This case was initiated in November 2009, has progressed through several amended

14  pleadings which revised and expanded claims, and Plaintiffs maintain they have developed a

15  strong case.  [Doc. No. 88-1.]  Defendant disagrees and, should the case not settle, has committed

16  to vigorously contesting the asserted claims. [Doc. No. 92.]   But both parties acknowledge the

17  significant risks and costs presented by further litigation and thus avoided by this reasonable

18  compromise.  Settlement was reached at the class certification stage with much of the case still to

19  be litigated and thus prevents the likely expense, complexity, and duration of, *inter alia*, full

20  discovery, summary judgment, expert reports, trial, and subsequent appeals.  Numerous significant

21  issues remain in dispute, including, *e.g.*, whether California or federal minimum wage laws apply,

22  whether the claims are amenable to class wide proof, whether common issue predominate, and the

23  measure and extent of damages.  Not only expensive, going forward despite the many complex

24  issues still in dispute risks further exposure and uncertainty for Defendant as well as impairment or

25  delay of relief to the class.

26       Against these considerations, the parties have agreed to a settlement with a total financial

27

28       [2]      The lone objection to the settlement, that of James Cole, was found meritless and
    denied as detailed in a prior order of the Court. [Doc. No. 98.]

value of over $11,600,000, which results in individual payouts to claimants in subclasses 1 and 2 equating to over 180% and 140% of estimated damages, respectively. [*See* Doc. No. 88-5 at 4-5.] And subclass 2 receives a payout of over 35% of estimated damages as well as total subclass relief of over $9,000,000 in debt, which equates to at least another $500 in value to each member of subclass 2.  This is an extremely favorable result given the considerable challenges the class faces should litigation continue.  Moreover, the settlement avoids the risks of extreme results on either end, *i.e.*, complete or no recovery.  Thus, it is plainly reasonable for the parties at this stage to find that the actual recovery realized and risks avoided here outweigh the opportunity to pursue potentially more favorable results through full adjudication.  These factors support approval.  *See Officers for Justice*, 688 F.2d at 625 (settlement is necessarily "an amalgam of delicate balancing, gross approximations and rough justice."); *Facebook*, __F.3d__, 2012 WL 4125857, at *3 ("the question whether a settlement is fundamentally fair . . . is different from the question whether the settlement is perfect in the estimation of the reviewing court.").

**B.    Endorsement of Experienced Counsel**

Class counsel attest to decades of experience litigating class actions, including similar labor and overtime litigation as well as a range of other complex matters.  [*See* Doc. No. 81-1 (Declaration of A. Mark Pope); Doc. No. 81-5 (Declaration of Douglas J. Campion).]  Given their extensive experience and understanding of the strengths and weaknesses of cases such as this, class counsel's endorsement weighs in favor of final approval.  *See Singer v. Beckon Dickinson and Co.*, 2010 WL 2196104, at *6 (S.D. Cal. June 1, 2010).

**C.    Reaction of the Class**

The reaction of the class has been almost entirely positive.  Of the over 7,000 class members noticed, 3,069 have submitted claims and only ten have opted out. [*See* Doc. No. 88-7, Ex. F (list of individuals who have opted-out).]  Only a single class member objected, which objection the Court overruled as meritless.  [*See* Doc. No. 98.]  The small percentage of opt-outs and objectors strongly supports the fairness of the settlement.  *Cf. McPhail v. First Command Financial Planning, Inc.*, 2009 WL 938841, at *3 (S.D. Cal. March 30, 2009) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the

1    settlement.") (internal citations omitted).

2           **D.      No Suggestion Of Collusion**

3           No aspect of the settlement suggests collusion.  Rather it was reached after conference

4    before the Honorable William J. McCurine and three full days of mediation before the Honorable

5    Leo S. Papas (Ret.), [*see* Doc. 88-5 (Declaration of A. Mark Pope)], and neither the requested

6    attorneys' fees nor the requested incentive awards appear unreasonable, [*see infra*]. Nor has even

7    the lone objector suggested collusion.  Much to the contrary, the circumstances and extent of the

8    parties' negotiations suggest fundamental fairness and thus weigh in favor of approval.

9           In light of the foregoing reasons, the Court finds the settlement fair, adequate, and free of

10   collusion, and thus **GRANTS** final approval of the settlement.

11   **II.    Attorneys' Fees**

12          This action asserts California claims premised on diversity jurisdiction, and thus the Court

13   applies California law to determine both the right to and method for calculating fees.  *See*

14   *Mangold*, 67 F.3d at 1478.  Under California law, the primary method for determining the amount

15   of reasonable attorneys' fees is the lodestar method, which multiplies the number of hours

16   reasonably expended by a reasonable hourly rate with the court increasing or decreasing that

17   amount by applying a positive or negative multiplier based on, among other factors, the quality of

18   representation, the novelty and complexity of the issues, the results obtained, and the contingent

19   risk presented.  *In re Consumer Privacy Cases*, 175 Cal.App.4th 545, 556–57 (2009). But in cases

20   such as this, where the class benefit can be monetized with a reasonable degree of certainty, a

21   percentage of the benefit approach may be used. *Id.* at 557–58 (citing *Lealao v. Beneficial*

22   *California, Inc*., 82 Cal.App.4th 19, 26–27 (2000)).

23          Under the percentage method, California has recognized that most fee awards based on

24   either a lodestar or percentage calculation are 33 percent and has endorsed the federal benchmark

25   of 25 percent.  *In re Consumer Privacy Cases*, 175 Cal.App.4th at 556 n. 13.  As to the settlement

26   fund amount: ". . . The total fund could be used to measure whether the portion allocated to the

27   class and to attorney fees is reasonable." *Id.* at 553–54 (citing Manual for Complex Litigation (4th

28   ed. 2008) § 21.71, p. 525).  Always, "[t]he ultimate goal is to award a reasonable fee."  *See*

*Hartless v. Clorox*, 273 F.R.D. 630, 645 (S.D. Cal. 2011).

Here, the settlement confers a total financial benefit to the class in excess of $11,600,000, including both a non-reversionary cash payment of $2,625,000 and over $9,000,000 in reimbursement/debt relief for those class member that CRST claims owed payment pursuant to Driver Employment Contracts (*i.e.*, for not working a full 8 months after truck driver training school).  Additionally, the settlement confers non-financial benefits, including CRST's agreement to contact credit reporting agencies to remove record of debt relieved by the settlement, and substantial changes to CRST's training program that will benefit drivers going forward.

In light of the results achieved, the requested fees appear reasonable.  The settlement provides for, and class counsel here seeks, an award of $875,000 in fees which constitutes 33 1/3 % of the cash payment but only 7.5 % of the total $11,650,000 financial value of the settlement. These percentages compare favorably with both California (33%) and federal (25%) benchmarks. The requested fee compares well with a lodestar cross-check as well.  Applying class counsel's hourly rates ranging from $150 to $450, which fall within if not below typical rates for attorneys of comparable experience, the total lodestar totals $586,916.50.  [*See, e.g.*, Doc. No. 81-3 at 78 (summary class counsel hourly rates and hours expended).]  An approximately 1.5 lodestar multiplier results in the $875,000 requested fee.  This appears reasonable given the risks borne by counsel proceeding on contingency, the duration and complexity of the case, as well as the substantial benefit realized for the class.  *See Singer*, 2010 WL 2196104, at *8 (awarding 33 1/3% in wage and hour class action); *Ingalls v. Hallmark Mktg. Corp.*, 08cv4342 (C.D. Cal. Oct. 16, 2009) (awarding 33.33% fee on a $5.6 million wage and hour class action); *Birch v. Office Depot, Inc.*, Case No. 06cv1690 (S.D. Cal. Sept. 28, 2007) (awarding a 40% fee on a $16 million wage and hour class action); *Rippee v. Boston Mkt. Corp.*, Case No. 05cv1359 (S.D. Cal. Oct. 10, 2006) (awarding a 40% fee on a $3.75 million wage and hour class action).

So, too, the requested costs appear reasonable.  The settlement provides for not more than $35,000 in attorney costs as well as reasonable costs for notice and claims administration.  Class counsel seek $29,160.32 in attorney costs and $86,500 in claims administration costs.  [*See* Doc. No. 88.]  These amounts are within that contemplated by the settlement, have been endorsed by

1  experienced counsel and claims administration consultants involved in this case, and are thus

2  presumed reasonable.  [*See id*.]  Further, nothing suggests the contrary.  *See In re Media Vision*

3  *Tech. Sec. Litig*., 913 F. Supp. 1362, 1366 (N.D. Cal. 1996) (costs and expenses incurred by

4  experience counsel in creating or preserving a common fund presumed reasonable); *see also In re*

5  *Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177-78 (S.D. Cal. 2007) (finding such costs

6  and expenses "necessary" to class action litigation).

7      Thus, the Court hereby **GRANTS** Plaintiffs' requested fees and costs.

8  **III.    Incentive Payments to Class Representatives**

9      Each of the three Class Representatives seeks an incentive payment of $15,000 for their

10  service in prosecuting this action on behalf of the class.  [*See* Doc. No. 88-1 at 20.]  "The criteria

11  courts may consider in determining whether to make an incentive award include: 1) the risk to the

12  class representative in commencing suit, both financial and otherwise; 2) the notoriety and

13  personal difficulties encountered by the class representative; 3) the amount of time and effort spent

14  by the class representative; 4) the duration of the litigation and; 5) the personal benefit (or lack

15  thereof) enjoyed by the class representative as a result of the litigation." *Van Vranken v. Atlantic*

16  *Richfield Co.*, 901 F.Supp. 294, 299 (N.D. Cal.1995) (citations omitted).

17      Here, all of these factors weigh in favor of the awards sought. This employment class

18  action risked and continues to risk the Class Representatives' reputations and future employability

19  in the field.  It also exposed them to the possibility of joint and several liability for counterclaims.

20  *See Martin v. AmeriPride Services, Inc*., 2011 WL 2313604 (S.D. Cal. 2011) (acknowledging

21  professional and legal risks posed to employees participating as class representatives in

22  employment class actions).  Further, each representative was active in assisting class counsel in a

23  wide variety of respects from initiating the case, participating in conferences among opposing

24  counsel, as well as investigators and other retained consultants, providing factual background and

25  support, analyzing employment and training manuals, pay stubs, CRST document productions, and

26  the contracts in dispute, and communicating with class counsel regularly in regard to the claims,

27  defenses, and legal strategy in the case.  Casas and Newmann attended the settlement conference

28  before Judge McCurine and the first mediation session before Judge Papas.  Smith was unable to

10cv1116

1    attend in person because of health issues, but made himself available for consultation by telephone

2    as needed.  [*See* Doc. Nos. 88-2, 88-3, 88-4 (Declarations of Smith, Casas, and Newmann,

3    respectively).]   This record of active involvement despite the risks posed supports approval of

4    incentive awards. *Van Vranken*, 901 F.Supp. at 300.

5         Moreover, the amount of the incentive payments requested, $15,000, is well within the

6    range awarded in similar cases.  *See Singer,* 2010 WL 2196104, at *9 ($25,000 incentive award);

7    *Martin*, 2011 WL 2313604 ($18,500 incentive award); *Brotherton v. Cleveland*, 141 F.Supp.2d

8    907, 913–14 (S.D. Ohio 2001) ($50,000 incentive award); *Van Vranken*, 901 F.Supp. at 300

9    ($50,000 incentive award).

10        Thus, the Court hereby **GRANTS** the requested class representative incentive awards.

11                                **CONCLUSION**

12        For the foregoing reasons, the Court hereby:

13        •    **GRANTS** final settlement approval;

14        •    **GRANTS** Plaintiffs' requests for class representative incentive awards;

15        •    **GRANTS** Plaintiffs' motion for attorneys' fees and costs.

16        **IT IS SO ORDERED.**

17   **DATED:**     January 14, 2013

18                               **IRMA E. GONZALEZ**
                                 **United States District Judge**

- 9 -                                                    10cv1116